UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| DR. MANAV DAS,<br><br>Plaintiff,<br><br>v.<br><br>GENERAL CASUALTY COMPANY OF WISCONSIN, *et al.*,<br><br>Defendants. | Civil Action No. 3:25-CV-00045-CHB<br><br>**MEMORANDUM OPINION AND ORDER** |

*** *** *** ***

This matter is before the Court on Defendants General Casualty Company of Wisconsin ("GCCW") and QBE Insurance Corporation's ("QBE") Motion for Summary Judgment. [R. 14]. Plaintiff Dr. Manav Das responded in opposition, [R. 20], and Defendants replied, [R. 21]. This motion is therefore ripe for review. For the following reasons, the Court will grant Defendants' Motion for Summary Judgment as to all claims in this matter.

## I. BACKGROUND

This case arises from GCCW's refusal to provide coverage and indemnification for its insured, Springfield Furniture Moving, LLC and its owners (collectively the "Springfield Defendants"), in relation to the negligent loss of Das's personal property. [R. 1]. The underlying facts of this case are largely undisputed. *See generally* [R. 14]; [R. 20]; [R. 21]. In August 2014, Das moved from Louisville, Kentucky to Chicago, Illinois for an employment opportunity. [R. 20-1, p. 5].[1] Because this move required Das to substantially downsize, Das contracted with the

[1] To clarify, [R. 20-1] is the underlying complaint filed against the Springfield Defendants in Das's original, state-court case against those defendants filed back in February 2020. It is not the complaint filed against Das's insurers in this case. [R. 1-1, pp. 2–13].

Springfield Defendants to move some of his property to his new Chicago residence and to store the remaining property in Louisville on a long-term basis. *Id.* At least one of the Springfield Defendant's represented to Das that he would "store and protect" his property. *Id.* at 6. Das's personal property was secured at the Louisville property using a padlock, but only the Springfield Defendants possessed the sole key to unlock the unit. [R. 20-7, p. 6]. At one point in early 2017, the Springfield Defendants moved Das's stored personal property between units. [R. 20-1, p. 7]; [R. 20-6, p. 8].

In 2019, Das contacted the Springfield Defendants to coordinate accessing and removing some of his personal property during a business trip. [R. 20-1, p. 7]. However, upon connecting with the Springfield Defendants, Das discovered that his personal property had been donated to a charity based on the mistaken belief that Das had abandoned that personal property. *Id.* at 7–9; [R. 20, p. 4]. In total, Das estimated that over $280,000.00 of his personal property was lost due to this negligent donation by the Springfield Defendants. [R. 20-1, p. 8]. Das thereafter sued the Springfield Defendants in state court alleging claims of fraud, breach of contract, conversion, civil conspiracy, and negligence. [R. 20-1, pp. 10–14].

In March of 2020, GCCW, the Springfield Defendants' insurer, received notice of Das's suit. [R. 14-4]. Later that same month, GCCW's Senior Claims Specialist sent a letter to the Springfield Defendants stating that it would deny coverage for the claims asserted by Das. [R. 14-7]. That letter cited the same provisions of the Springfield Defendants' Policy No. CCI1186636 ("Policy") that are at issue in this case. *Id.* First, the letter cited to the Policy's Coverages section, which provides that "[t]his insurance applies to 'bodily injury' and 'property damage,'" but only if "[t]he 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory.'" *Id.* at 2; *see also* [R. 14-1, p. 29]. The Policy defines "occurrence" as "an

accident, including continuous or repeated exposure to substantially the same general harmful conditions." [R. 14-1, p. 43]. GCCW's letter explained its belief that the facts surrounding the Springfield Defendants' donation of Das's personal property do not amount to an "occurrence" under the Policy. [R. 14-7, p. 4]. The letter went on to explain that, even if the matter constituted an occurrence, either the "Care, Custody or Control" ("CCC") or the "Expected Or Intended Injury" ("EII") exclusions apply. *Id.* As a result, GCCW denied coverage and "disclaim[ed] any obligation under the Policy to defend or indemnify" the Springfield Defendants in connection with the Das's state court lawsuit. *Id.*

Ultimately, the Springfield Defendants hired their own counsel and the case progressed. [R. 14, p. 5]; [R. 20, p. 5]. Shortly before that case was to go to trial, Das and the Springfield Defendants entered into a stipulated judgment in the amount of $280,000.00 for the claim of negligence. [R. 20-2]. The stipulated judgment stated that Das "will forbear any attempt to collect judgment from the [Springfield Defendants] for any amount over $270,000.00 with the exception of execution and collection against [GCCW] and [QBE] or any other insurer." *Id.* at 3. Further, the stipulated judgment assigned Das the right to pursue a cause of action for any claims the Springfield Defendants may have against the insurer including bad faith claims. *Id.* at 2.

On December 20, 2024, Das filed a lawsuit in state court pursuing those assigned claims against GCCW and QBE and alleging claims for breach of contract, common law bad faith, and violations of Kentucky's Unfair Claim Settlement Practices Act. [R. 1-1, pp. 7–12]. On January 21, 2025, this case was removed to this Court. [R. 1]. On October 2, 2025, Defendants filed this Motion for Summary Judgment. [R. 14]. Das responded in opposition, [R. 20], and Defendants replied, [R. 21]. The matter stands submitted for review.

## II. LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Winkler v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 477 U.S. at 248. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

The moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Anderson*, 477 U.S. at 256. The moving party may satisfy that burden by demonstrating an absence of evidence to support an essential element of the non-moving party's case for which the non-moving party bears the burden of proof. *Celotex Corp.*, 477 U.S. at 323. In ruling on a motion for summary judgment, a court must construe the evidence and draw all reasonable inferences based on the underlying facts in favor of the nonmoving party.

If the moving party presents sufficient evidence to support its claim that no genuine issue of material fact is present in the case, the burden then shifts to the non-moving party to produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find

there to be a genuine fact issue for trial." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995) (citation omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, the Court is not obligated to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). Instead, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.* In doing so, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). The non-moving party's evidence must result in more than mere "metaphysical doubt as to the material facts," and "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position" will not suffice for the non-moving party to meet its burden. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted); *Anderson*, 477 U.S. at 252. Ultimately, there is no genuine issue of material fact and summary judgment is appropriate if the record, taken as a whole and viewed in the light most favorable to the non-moving party, could not lead the trier of fact to find for the non-moving party. *Matsushita Elec.*, 475 U.S. at 587 (citation omitted).

## III. ANALYSIS

Defendants argue that summary judgment is proper because QBE is not a proper party to the case and GCCW owed no duty to defend or indemnify the Springfield Defendants under the

Policy regarding the loss of Das's personal property, either under the language of what is covered or under one of the enumerated exclusions. [R. 14]. In his response, Das argues that GCCW did in fact owe to the Springfield Defendants a duty to defend and a duty to indemnify under the Policy. [R. 20]. As explained below, the Court agrees with Defendants that, based on the factual record, there exists no genuine dispute of a material fact and, even when viewing the facts in the light most favorable to Das, Defendants are entitled to summary judgment as a matter of law as to all claims asserted in this matter.

### A. QBE as a Party to the Case

As a preliminary matter, Defendants argue that QBE, of which GCCW is a member company of, [R. 14-7, p. 1], is not a proper party to this action. [R. 14, p. 7]. Specifically, Defendants state that "[b]ecause QBE did not issue any policy of insurance to any of the Springfield Defendants, it cannot be liable to them (or anyone else) for breach of contract or bad faith." *Id.* In support of this argument, Defendants provide a sworn affidavit supporting the assertion that QBE has never issued an insurance policy to the Springfield Defendants. [R. 14-2]. Das makes no attempt to counter this assertion or otherwise address it in his response. *See generally* [R. 20]. Accordingly, Das has abandoned his claims against QBE, and the Court will grant QBE summary judgment as to all claims asserted in this matter. *See Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) ("The district court properly declined to consider the merits of this claim because Hicks failed to address it in either his response to the summary judgment motion or his response to Concorde's reply brief."); *Clark v. City of Dublin*, 178 F. App'x 522, 524–25 (6th Cir. 2006) (recognizing that the plaintiff's failure to properly respond to arguments made in the defendant's motion for summary judgment entitled the

defendant to summary judgment). Moreover, to the extent that Das argues QBE owed him a duty under the Policy, the Court explains below that the CCC exclusion applied.

### B. Care, Custody or Control Exclusion

Das's statutory and bad faith claims are based on GCCW's alleged failure under both its duty to defend and duty to indemnify. *See* [R. 1-5, pp. 9–12]. "A duty to defend is separate and distinct from a duty to indemnify." *Westlake Vinyls, Inc. v. Goodrich Corp.*, 518 F.Supp.2d 918, 936 (W.D. Ky. 2007). "[T]he duty to defend is broader than the duty to indemnify." *St. Paul Guardian Ins. Co. v. City of Newport, KY*, 804 F. App'x 379, 382 (6th Cir. 2020) (quoting *James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 280 (Ky. 1991)). Accordingly, the Court will address Das's claims under each theory of duty separately.

#### 1. Duty to Defend

Under the duty to defend, "[t]he defense clause in the contract is a contractual right of the insured for which he has paid a premium, regardless of other insurance and of any primary or excess coverage." *Wolford v. Wolford*, 662 S.W.2d 835, 838 (Ky. 1984). This duty applies in "any suit in which the language of the complaint would bring it within policy coverage regardless of the merit of the action." *Id.* Specifically, "an insurer has a duty to defend if there is any allegation which potentially, possibly or might come within the coverage terms of the insurance policy." *Aetna Cas. & Sur. Co. v. Com.*, 179 S.W.3d 830, 841 (Ky. 2005), *as modified on reh'g* (Jan. 19, 2006). Whether the insurer owes a duty to defend is a question of law for the Court to decide. *Owners Ins. Co. v. Frontier Hous., Inc.*, 291 F. Supp. 3d 810, 813 (E.D. Ky. 2017). The Court makes this determination by comparing the allegations in the underlying complaint with the terms of the policy. *See Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 507 (6th Cir. 2003) ("Under Kentucky law, a court should determine at the outset of litigation whether an insurance company

has a duty to defend its insured by comparing the allegations in the underlying complaint with the terms of the insurance policy.”).

While GCCW argues that the events giving rise to the underlying state court lawsuit did not constitute an “occurrence” under the Policy, [R. 14, pp. 9–12], the Court first considers whether the CCC exclusion applies. That is, even assuming that an “occurrence” triggered coverage under the Policy, the Court considers whether coverage would nevertheless be excluded. On this point, GCCW argues that under the CCC exclusion, GCCW owed no duty (either to defend or indemnify) for claims arising out of the loss of Das’s property. [R. 14, pp. 13–16]. The CCC exclusion specifically stated that “[t]his insurance does not apply to: . . . ‘Property damage’ to: . . . Personal property in the care, custody or control of the insured.” [R. 14-1, pp. 30, 32–33]. GCCW argues that the Springfield Defendants’ loss of Das’s property squarely falls within the clear language of the exclusion, and therefore, Defendant owed no duty under the Policy. [R. 14, pp. 13–16].

“Where the terms of an insurance policy are clear and unambiguous, the policy will be enforced as written.” *Kemper Nat. Ins. Cos. v. Heaven Hill Distilleries, Inc.*, 82 S.W.3d 869, 873 (Ky. 2002) (citing *Am. Nat’l Bank and Tr. Co. v. Hartford Accident and Indemnity Co.,* 442 F.2d 995, 999 (6th Cir.1971)). The Sixth Circuit has further stated that

> [b]ecause coverage exclusions are contrary to the fundamental protective purpose of insurance, they are strictly construed against the insurer and will not be extended beyond their clear and unequivocal meaning. But that strict construction should not overcome plain, clear language resulting in a strained or forced construction.

*Kemper*, 82 S.W.3d at 873–74 (citation and quotation marks omitted). Lastly, “[i]f any one exclusion applies there should be no coverage, regardless of inferences that might be argued on the basis of exceptions or qualifications contained in other exclusions.” *Id.* at 874 (alteration in original) (citation and quotation marks omitted).

The Court finds the Kentucky Supreme Court's decision in *Kemper* to be factually analogous and controlling in this case. In *Kemper*, the Kentucky Supreme Court held that an identical CCC exclusion applied to aging bourbon barrels that were sold to customers but stored at the distillery's warehouse while they completed the carefully controlled aging process. *Id.* at 873–74. Ultimately, a fire broke out at the warehouse and destroyed many of these aging bourbon barrels. *Id.* As a result, the distillery paid several million dollars in damages, then made a demand for coverage under its general liability policy. *Id.* at 871. The insurer denied coverage. *Id.* In the declaratory judgment action that followed, the trial court granted summary judgment in favor of the insurer, and the Supreme Court of Kentucky agreed, finding that the policy's CCC exclusion applied. *See id.* at 873–74.

The CCC exclusion in *Kemper* used the exact same language as the Policy here. *Compare Kemper*, 82 S.W.3d at 873 ("This insurance does not apply to: . . . 'Property damage' to: . . . Personal property in the care, custody or control of the insured."), *with* [R. 14-1, pp. 30, 32–33 (same)]. The *Kemper* Court held that this language was unambiguous. *Kemper*, 82 S.W.3d at 873–74; *see also W. Am. Ins. Co. v. Prewitt*, 401 F. Supp. 2d 781, 788 (E.D. Ky. 2005), *aff'd*, 208 F. App'x 393 (6th Cir. 2006) ("[T]he Kentucky Supreme Court has recently determined that 'care, custody, or control' exclusions are not ambiguous." (citing *Kemper*, 82 S.W.3d at 873)). In finding that the clear language of the CCC exclusion applied, the Kentucky Supreme Court stated that the distillery "stored the bourbon in its warehouses, which were located on its premises and controlled by its employees, so the bourbon was in Heaven Hill's care, custody or control." *Kemper*, 82 S.W.3d at 873.

As in *Kemper*, the facts alleged in the underlying complaint against the Springfield Defendants here show that Das's personal property was squarely within the care, custody, or

control of the Springfield Defendants. While storage unit businesses typically function more akin to a leasing operation, *see Jones v. Hanna*, 814 S.W.2d 287, 289–90 (Ky. Ct. App. 1991), the alleged facts surrounding the storage of Das's personal property demonstrate a uniquely high level of control by the Springfield Defendants. As alleged by Das in the complaint of his case against the Springfield Defendants, one of the Springfield Defendants represented that he would "store and *protect*" Das's personal property. [R. 20-1, p. 6 (emphasis added)]. Further, the Springfield Defendants "unilaterally made the decision" of where Das's property would be stored. *Id.* The Springfield Defendants accessed and moved Das's personal property out of or between storage units. *Id.* Lastly, when the Springfield Defendants moved Das's personal property between units in 2017, they never communicated to Das where this new storage unit was located. *Id.* at 7. When taken together, all of these facts alleged in the underlying complaint show that Das's personal property was squarely within the care, custody, or control of the Springfield Defendants.

Moreover, the Kentucky Supreme Court has held that "[i]n the situation of a bailment it is clear that an exclusionary clause which declines coverage of property in the 'care, custody or control of the insured' would be applicable." *Ronalco, Inc. v. Home Ins. Co.*, 606 S.W.2d 160, 162 (Ky. 1980). "[A] bailment is created by 'delivery of the thing in trust for some special object or purpose.'" *Id.* at 161–62 (quoting *Commonwealth v. Polk*, 75 S.W.2d 761, 764 (1934)). As noted above, storage unit businesses typically function more akin to a leasing operation. *See Hanna*, 814 S.W.2d at 289–90.

> While the fact that one rents a definite space in which to store goods does not show conclusively that the arrangement is a lease rather than a bailment, one who merely grants storage room, without assuming, expressly or impliedly, any duty or responsibility with respect to the care or control of the property stored, is not a bailee.

*Id.* at 289 (quoting 8 Am. Jur. 2d Bailments § 31 (2026)). In *Hanna*, the Kentucky Court of Appeal found that no bailment was created based on the following facts:

> In our fact pattern, the storage units, 180 in all, were protected by a 6 ft. fence and a locked gate. The *tenants placed their own locks* on the units. No security dogs or watchmen were provided. Access could be made to the units between 6 a.m. and 9 p.m. daily. No inventory was made of the goods by the facility owner, and the *goods were never placed in the hands of the landlord*. In fact, it is *unknown by the landlord what was stored*.
>
> Appellee . . . by deposition explained: "*Just storage units that you control. You put your own lock on and come and go as you please when the gates are open.*"

*Id.* at 289–90 (emphasis added).

The Court finds that a bailment was likely created here by the Springfield Defendants and their unique level of control in the storage of Das's personal property. The facts from *Hanna* could hardly be more distinguishable from this case. Here, as alleged in the underlying complaint, one of the Springfield Defendants represented to Das that he would "store and *protect*" Das's personal property. [R. 20-1, p. 6 (emphasis added)]. The Springfield Defendants accessed and controlled Das's personal property both while initially storing it and when unilaterally deciding to move it between different storage units. *Id.* Lastly, Das was kept in the dark on the new location of his property after the move. *Id.* at 7. These alleged facts demonstrate that a bailment was likely created here. *See also Eifler v. Shurgard Cap. Mgmt. Corp.*, 71 Wash. App. 684, 690, 861 P.2d 1071, 1075 (1993) ("[A] bailment was created when Eifler left his car keys with Vi and Ed Reinhart. By doing that, he impliedly authorized them to move the car around the premises."); *Williams v. Smith Ave. Moving Co.*, 582 F. Supp. 2d 316, 321 (N.D.N.Y. 2008) (finding that a bailment was created for the storage of personal property by a moving company). However, even if a bailment was not created, as stated above, the CCC exclusion still otherwise applies. *See Ronalco*, 606 S.W.2d at

162 ("Having determined that no bailment existed, we must still face the question of whether the damaged property was nevertheless within the care, custody or control of Ronalco.").

Das provides various arguments as to why the CCC exclusion does not apply here. First, Das argues that *Kemper* is not controlling because the aging bourbon barrels in that case were "work product" of the insured. [R. 20, pp. 15–16]. Das states that, seemingly because of this difference, *Kemper* "is a far cry from the facts and circumstances present in the current case." *Id.* at 16. The Court disagrees. The *Kemper* Court makes no direct mention of the importance of the bourbon barrels being the insured's work product. *See generally* 82 S.W.3d at 873–74. In fact, the only mention of the bourbon barrels being inventory sold to customers is to establish that the bourbon barrels were in fact "personal property of others." *See Kemper*, 82 S.W.3d at 873 ("Heaven Hill sold the bourbon destroyed in the fire to its customers, making it the personal property of others."). The *Kemper* Court did note that one purpose of the CCC exclusion

> is to prevent the general liability insurer from becoming a guarantor of the insured's workmanship in his ordinary operations. Failures of workmanship are a normal business risk which the insured is in the best position to prevent. If such risk be transferred to the insurer via general liability provisions, the cost of general liability coverage will be greater. The "care, custody or control" exclusion is designed to avoid such result.

*Id.* at 874 (citation omitted). However, the *Kemper* Court did not go as far as to suggest that "workmanship" is required for the application of all CCC exclusions, or that it is inappropriately applied for storage services like the Springfield Defendants provided Das. *See id.*[2] Instead, in

[2] Relatedly, the parties both cite to language from *Ronalco* that states that the personal property must be "a necessary element of the work involved." [R. 14, p. 13 (quoting *Ronalco*, 606 S.W.2d at 162)]; [R. 20, pp. 14–15 (same)]. However, by neglecting to even mention this standard in its more recent opinion, *see Kemper*, 82 S.W.3d at 873–74, the Kentucky Supreme Court makes clear that this standard from *Ronalco* does not apply in all contexts. The Court finds that this language from *Ronalco* to be largely inapplicable to this case, or if it is applicable, easily met by the nature of storage services done by the Springfield Defendants. *See Cincinnati Ins. Co. v. Berkshire Refrigerated Warehousing, LLC*, No. 15 C 686, 2017 WL 3642024, at *10 (N.D. Ill. Aug. 24, 2017) ("[A]s a business that provides warehousing services to its customers . . . [the insured] storing equipment for its second largest customer constitutes a necessary part of its business . . . because without offering to store materials for its customers, [the insured] would be out of business.").

finding that the CCC exclusion applied, the Kentucky Supreme Court pointed out only that the distillery "stored the bourbon in its warehouses, which were located on its premises and controlled by its employees," *id.*, which is all analogous to this case.

Next, Das seems to suggest that the Springfield Defendants must have been providing repair services on his personal property in order for the CCC exclusion to apply. [R. 20, p. 15]. Specifically, Das argues "[f]or application to the present case, we must ask, were the Springfield Defendants providing repair services to the Das personal property? Obviously, they were not." *Id.* It is true that the CCC exclusion is often applied when an insured entity provides repair services on the personal property of another. *See, e.g.*, *Ronalco*, 606 S.W.2d at 162 (finding that the CCC exclusion only applied to the inner lining of a furnace that was to be repaired by the insured and not the furnace's outer shell that was damaged during the repair); *U.S. Fid. & Guar. Co. v. Wells*, 380 S.W.2d 75, 75–76 (Ky. 1964) (holding that a CCC exclusion applied in a case where a car owner brought his car into a mechanic's shop, the owner and the mechanic together worked on welding a new tailpipe onto the car, and the car caught fire and was destroyed). However, the Kentucky Supreme Court's holding in *Kemper*—where no repair services were being applied to the aging bourbon barrels—made clear that providing repair services is not necessary to the CCC exclusion's application. *See* 82 S.W.3d at 872–74; *cf. Jones v. Nationwide Gen. Ins. Co.*, No. 2021-CA-0818-MR, 2022 WL 1275387, at *1 (Ky. Ct. App. Apr. 29, 2022) (concluding in a dog-bite case that an insurer owed no duty under a policy that excluded "bodily injury or property damage . . . caused by any of the following animals owned by or in the care, custody, or control of an insured"). And Das cites to no authority stating that the CCC exclusion is limited to the repair context. *See* [R. 20, p. 15]. Accordingly, the Court finds no "repair services" requirement for the CCC exclusion to apply. *See also W. Am. Ins. Co. v. Prewitt*, 401 F. Supp. 2d 781, 785–89 (E.D.

Ky. 2005) (holding that a similar CCC exclusion applied in a case that clearly did not involve a work-product or repair-services requirement where two friends took turns sailing a boat that was later damaged), *aff'd*, 208 F. App'x 393 (6th Cir. 2006).

This conclusion is supported by the various other courts that have similarly applied CCC exclusions for stored personal property. *See, e.g.*, *Cashmere Pioneer Growers, Inc. v. Unigard Sec. Ins. Co.*, 891 P.2d 732, 733–35 (Wash. App. 1995) (applying a CCC exclusion for the plaintiff's property being stored in the insured's storage facility despite entry of a stipulated judgment that the damage was caused by the storage facility's negligence); *New Hampshire Ins. Co. v. Abellera*, 495 P.2d 668, 669–70 (1972) (applying a CCC exclusion to a dragster owned by a friend of the homeowners which was destroyed by fire while stored in their garage); *Cincinnati Ins.*, 2017 WL 3642024, at *1–*2, *8–*10 (applying a CCC exclusion to the plaintiff's baking equipment that was stored using the insured's warehousing services); *Navarro Pecan v. Penn Am. Ins.*, No. 01-31183, 2002 WL 663751, at *1–*2 (5th Cir. Mar. 29, 2002) (applying a CCC exclusion to the plaintiff's personal property that was damaged while being stored at its insured's cold storage facility); *Park 'N Go of Georgia, Inc. v. U.S. Fid. & Guar. Co.*, 471 S.E.2d 500, 503–04 (Ga. 1996) (applying a CCC exclusion to an insured's open-air garage facility).

Das also argues that "case law in Kentucky makes it clear that actual control" is required for the CCC exclusion to apply. [R. 20, pp. 14–16]. Das cites to no authority to stand for this proposition; instead, Das broadly references the *Ronalco* case as "instructive" on this point. *Id.* at 16. Although *Ronalco* highlights the importance of control for the CCC exclusion to apply, *see* 606 S.W.2d at 162–63, the Kentucky Supreme Court has never established an actual control standard as Das suggests. *See also Kemper*, 82 S.W.3d at 873–74 (making no mention of an actual control standard). But regardless, even if this were the required standard, the Springfield

Defendants demonstrated actual control when they unilaterally planned and effectuated relocating Das's personal property between storage units, as alleged in the underlying complaint. *See* [R. 20-1, p. 6]. Although Das did not object to the relocation, *id.*, the unilateral action taken by the Springfield Defendants demonstrates the actual control that they possessed over Das's personal property. This level of control is only further demonstrated by the underlying injury that led to this case: the donation of Das's personal property without his knowledge or consent. [R. 1-1]; [R. 20-1]. Accordingly, the Court finds that the CCC exclusion applies and thus GCCW owed no duty to defend the Springfield Defendants under the Policy based on the facts alleged in the complaint against the Springfield Defendants.

**2. Duty to Indemnify**

As detailed above, the CCC exclusion applies based on the facts alleged in the complaint against the Springfield Defendants, meaning no duty to defend was owed. *See* [R. 20-1, pp. 5–10]. And "[i]f there is no duty to defend, then there is no duty to indemnify because the duty to defend is broader." *Nautilus Ins. Co. v. Structure Builders & Riggers Mach. Moving Div., LLC*, 784 F. Supp. 2d 767, 771 (E.D. Ky. 2011) (citation omitted). Regardless, many of the facts asserted in the complaint are also further supported by the record. *See, e.g.*, [R. 20-6, p. 8]; [R. 20-7, p. 7]; [R. 20, pp. 3–4].[3] The only important additional fact that was learned through later discovery—specifically, the deposition of one of the Springfield Defendants—was that the Springfield Defendants possessed the sole key to unlock the storage unit containing Das's property. *See* [R. 20-

[3] Moreover, the facts alleged in the underlying complaint against the Springfield Defendants are fairly treated as part of the record for purposes of this motion. The Sixth Circuit has held that statements made by an attorney concerning a matter within the scope of his employment may be admissible against the party who retained the attorney and that "[p]leadings in a prior case may be used as evidentiary admissions." *Williams v. Union Carbide Corp.*, 790 F.2d 552, 555–56 (6th Cir. 1986) (finding that the trial court erred in prohibiting the defendant from using the allegations made in the plaintiff's complaint in another lawsuit where the plaintiff's attorney was fully authorized to act and speak for the plaintiff); *see also* [R. 20, p. 24 (attorney signature)]; [R. 20-1, p. 14 (attorney signature)]. "Absent unauthorized conduct on the part of the attorney, there is nothing unfair about having to explain one's past lawsuits." *Williams*, 790 F.2d at 556.

7, p. 6]. This fact provides further support for the Court's finding that the CCC exclusion applies here. Consequently, for all the same reasons discussed in detail relating to the duty to defend, the Court finds that GCCW likewise owed the Springfield Defendants no duty to indemnify under the Policy.

Accordingly, as GCCW owed no duty to defend or indemnify based on the CCC exclusion, the Court need not address GCCW's alternative arguments that it did not owe a duty under the Policy because the facts did not constitute an "occurrence"[4] or that the EII exclusion applies. *See* [R. 14, pp. 9–12, 16–17]. On the CCC exclusion alone, GCCW is entitled to summary judgment in its favor on the breach of contract claim.

### C. Bad Faith and Unfair Claim Settlement Practices Act Claims

The Kentucky Supreme Court has created a three-part test for common-law bad faith claims and claims under Kentucky's Unfair Claims Settlement Practices Act. *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993). Specifically, the *Wittmer* Court stated that

> [a]n insured must prove three elements in order to prevail against an insurance company for alleged refusal in bad faith to pay the insured's claim: (1) *the insurer must be obligated to pay the claim under the terms of the policy*; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed. An insurer is entitled to challenge a claim and litigate it if the claim is debatable on the law or the facts.

---

[4] While the Court need not address the merits of this argument, the Court notes that GCCW essentially acknowledges in its motion that at least the negligence claim in Das's case against the Springfield Defendants constituted an occurrence under the Policy. *See* [R. 14, pp. 9–12 (arguing on that the "majority" of Das's claims do not constitute an "occurrence" and making no mention of the negligence claim throughout this section of its motion)]. Das rightfully points out this concession in his response. [R. 20, pp. 8–9]. GCCW then tries to argue for the first time in its reply that "none of the claims trigger coverage." [R. 21, p. 3 (emphasis in original)]. However, by raising this argument for the first time in its reply brief, GCCW waived this argument. *See Foster v. MasTec N. Am.*, No. 3:21-CV-00737, 2023 WL 3513685, at *5 (M.D. Tenn. May 17, 2023) ("Generally speaking, arguments raised for the first time in reply briefs are waived, both for purposes of appeal and on motions for summary judgment in the district court."); *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010) (finding that arguments raised for the first time in a reply brief are waived); *Wright v. Holbrook*, 794 F.2d 1152, 1156 (6th Cir. 1986) (explaining that such arguments are waived because the opposing party has no opportunity to respond).

*Id.* at 890 (emphasis added). The Sixth Circuit has held that the *Wittmer* test applies to all bad faith claims under Kentucky law, "whether brought by a first- or third-party claimant or brought under common law or statute." *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 527 (6th Cir. 2006). Further, courts have repeatedly applied the *Wittmer* test to bad faith claims predicated on a theory of an insurer's failed duty to defend. *See, e.g.*, *Lenning v. Com. Union Ins. Co.*, 260 F.3d 574, 586 (6th Cir. 2001) (determining that a bad faith claim based on an alleged failure to defend a claim failed under the first element of the *Wittmer* test); *Outdoor Venture Corp. v. Philadelphia Indem. Ins. Co.*, No. 6:16-CV-182-KKC, 2020 WL 891213, at *2 (E.D. Ky. Feb. 24, 2020) (same), *aff'd*, 841 F. App'x 760 (6th Cir. 2020); *The Point/Arc of N. Kentucky, Inc. v. Philadelphia Indem. Ins. Co.*, 154 F. Supp. 3d 503, 515–16 (E.D. Ky. 2015) (applying the *Wittmer* test to a bad faith claim predicated on a theory of an insurer's failed duty to defend); *Pizza Magia Int'l, LLC v. Assurance Co. of Am.*, 447 F. Supp. 2d 766, 780 (W.D. Ky. 2006) (applying the same and finding that, even though the insurer owed a duty to defend, the plaintiff's bad faith claim failed under the third element of the *Wittmer* test because the insurer's denial "could not have been reckless or intentionally harmful"). Accordingly, for Das to succeed under either his common-law bad faith claim or his claim under Kentucky's Unfair Claim Settlement Practices Act, Das must first prove that GCCW was "obligated to pay the claim under the terms of the policy." *Wittmer*, 864 S.W.2d at 890.

The Kentucky Supreme Court has noted "that a plaintiff has a 'steep burden' of satisfying [the *Wittmer* test]." *Mosley v. Arch Specialty Ins. Co.*, 626 S.W.3d 579, 584 (Ky. 2021). A plaintiff fails under the *Wittmer* test if the insurer "had no duty to pay [the claimant] because of express exclusionary language in the policy." *Id.* at 585–86. In this case, the Court has already determined that GCCW had no duty to defend or indemnify under the Policy for any claims arising out of the

loss of Das's personal property. Accordingly, under the first element of the *Wittmer* test, GCCW is likewise entitled to summary judgment on all of Das's bad faith and Unfair Claim Settlement Practices Act claims.[5]

## IV. CONCLUSION

For the reasons stated above, the Court will grant summary judgment to Defendants as to all claims in this action. Accordingly, and the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1. Defendants' Motion for Summary Judgment, [**R. 14**], is **GRANTED**.
2. A separate judgment shall be entered contemporaneously with this Memorandum Opinion and Order.

This the 1st day of September, 2026.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY

---

[5] Das also repeatedly argues, [R. 20, pp. 21–24], and GCCW disputes, [R. 21, pp. 11–14], that GCCW denied coverage and defense of the Springfield Defendants by failing to conduct a meaningful and reasonable investigation. However, an insurer only has a duty to investigate "where it has no reasonable basis to refuse or reject the claim." *Hammond v. State Auto. Mut. Ins. Co.*, No. 2003-CA-001382-MR, 2004 WL 2151007, at *3 (Ky. Ct. App. Sept. 24, 2004); *see also Wittmer*, 864 S.W.2d at 891–92 ("[A]n insurer is under a duty to promptly investigate and pay claims where it has no reasonable grounds to resist in good faith."). Accordingly, since GCCW owed the Springfield Defendants no duty to defend or indemnify in this case, this argument also fails. *See Lenning*, 260 F.3d at 581, 587 (finding that the insurer had no duty to defend, and consequently, the insurer "had no duty to further investigate or wait to see if the allegations in Tapp's complaint somehow morphed, through amendment or otherwise . . . into claims falling within the coverage of the policy").